Hughes v. Johnson, Trustee.

---

## HUGHES v. JOHNSON, TRUSTEE.

1. MORTGAGE: *Effect of assignment of, as collateral security for mortgagee's debt.*

   A mortgagee does not lose his interest in the mortgage by assigning it to his creditor as collateral security for his own debt, though he stipulates in the assignment to forfeit all interest in the mortgage if he fail to pay his debt by a specified day, and fails to pay it. The agreement for forfeiture amounts to nothing in a court of equity.

2. MORTGAGE: *Parol agreement to extend to other debts.*

   A mortgage of lands cannot, by parol agreement, be made to cover any other debt, or any larger amount of debt than that expressed in it. (The case of *Bell, Trustee,* v. *Radcliff,* 32 *Ark.,* 635, reviewed and explained.)

3. APPLICATION OF PAYMENTS: *Running accounts; Election of parties; Mortgages*

   In running accounts only the debtor has the election to apply payments to any particular items of the account; and if he make no application the law will apply them to the earliest items on the account. The whole is one debt, and the creditor has no election. But even in case of a mortgage, the debtor may authorize the application of the fruit of part of the mortgaged property to unsecured items in the account, if no rights of others have intervened. The proof of such authority is upon the party alleging it.

·4.  SAME:  *Time for creditor to elect.*

When the creditor has, by law or consent, the right to make the application, he need not do so at the time of payment, but may at any time before settlement.

·5.  MORTGAGEES: *Reimbursed for advances to preserve mortgaged property.*

One having an interest in a security may advance what is fairly necessary for its preservation, and retain such advances out of the proceeds before crediting anything on his debts.  (In this case necessary advances for picking a mortgaged cotton crop, and for a gin to gin it, were allowed out of the first proceeds of the crop, as necessary expenses to preserve it.—REP.)

APPEAL from *Jefferson* Circuit Court in Chancery. Hon. X. J. PINDALL, Circuit Judge.

## STATEMENT.

On the twenty-ninth of May, 1876, W. G. Hughes and his wife executed to Moss & Bell, merchants at Pine Bluff, a mortgage upon certain lands and personal property, and fifty bales of cotton, to be raised on their place and the Holcomb place, in Jefferson county, that year, conditioned:

"That, whereas, the said Hughes and wife are indebted to the said Moss & Bell in the sum of two hundred and fifty dollars ($250), for goods, wares, merchandise and supplies, furnished to them during the year 1876, and also in the further sum of one thousand dollars ($1000), for goods, wares and merchandise, furnished and to be furnished during the year 1876, the exact amount to be ascertained from the books of the said Moss & Bell, and which sums ($1250) are payable and due on or before the first day of November, 1876.  Now, if the said Hughes and wife shall well and truly pay or cause to be paid to said Moss & Bell, on or before the first day of November, 1876, the full amount of such indebtedness as may be found due, then and in that case this conveyance shall be null and void; but

if default be made in the payment of such sum or sums as may be due, or any part thereof, at maturity, then said Moss & Bell may take possession" and sell and pay off the sums found to be due, and cost, etc.

On the twenty-seventh of June, 1876, Moss & Bell transferred this mortgage, by the following endorsement upon it:

"PINE BLUFF, ARK., June 27, 1876.

"For value received we transfer the within mortgage to W. D. Johnson, as the trustee of McGehee, Snowden & Violette, of New Orleans, La., to be held as collateral security for the payment of certain indebtedness to them; to be paid on or before the first day of January, 1877, or we forfeit all our interest in or to the annexed mortgage.

"MOSS & BELL."

On the second of March, 1878, W. D. Johnson, as trustee for McGehee, Snowden & Violette, filed in the Jefferson Circuit Court his complaint in equity against Hughes and wife, setting up and exhibiting the foregoing mortgage and transfer, and exhibiting an account of Moss & Bell against Hughes for two thousand six hundred and sixty-four dollars ($2664); of which sum the complaint alleged that the sum of one thousand one hundred and twenty-five dollars ($1125) was due and unpaid, and prayed judgment for that sum against Hughes; that it be declared a lien upon the mortgaged lands, and the lands be sold for its payment, and for general relief.

The account embraced sales of goods and supplies, and money advanced, at different dates, extending from March 23, 1876, to July 3, 1877, inclusive. The credits, amounting to one thousand five hundred and thirty-eight dollars ($1538), were principally for cotton, delivered and sold at different dates, from December 14, 1876, to March, 14, 1877.

On the sixth of November, 1878, Hughes and wife answered, admitting the mortgage, and that the account exhibited was correct and just; but denying that they, or either of them, then owed the alleged balance of one thousand one hundred and twenty-five dollars ($1125), and alleging that a large portion of the account, including said balance, was made in the year 1877, and after the maturity of the mortgage for the year 1876, and that said balance was secured by another mortgage, executed in 1877, upon thirty bales of cotton, to be raised by them that year, and for the express purpose of securing the supplies of that year; and which mortgage, together with various transfers of rental notes and other debts, was sufficient to secure said supplies for that year, including said balance; and that said supplies for 1877, including said balance, had been fully paid off by the proceeds of crops raised under said mortgage for 1877.

They knew nothing of the transfer of the mortgage of 1876 to the plaintiffs, and alleged that they had, out of proceeds of crops of that year, fully paid all that was due, not only to first of November, 1876, but to first of January, 1877, and for the latter year had made arrangements with Moss & Bell, as above stated. That the mortgage for 1876 was fully paid, and should be satisfied on the record.

They made their answer a cross-bill against Moss & Bell, and further claimed that the goods, supplies, etc., sold to them by Moss & Bell, after the transfer of the mortgage on the twenty-seventh of June, 1876, were sold and delivered on open account, without any security whatever, and that by virtue of said transfer, the lien of said mortgage became extinct as to all supplies and advancements made after that date; and they prayed that said mortgage be declared satisfied, and for other proper relief.

Moss & Bell answered, denying that any part of the account

had been paid, except what was credited on it, and alleged that the advancements in excess of the mortgage, were made at the express request of Hughes; that finding that the one thousand dollars ($1000) called for was not sufficient to complete and gather his crop of cotton, they furnished an additional sum at his special request, to pay for picking the cotton, and balance due on it to the hands, and an item of two hundred and eighty-two dollars ($282) for a gin to gin the cotton, and with the assurance of the defendants that there would be enough cotton to pay said advances, and also the sums secured by the mortgage, and with his agreement, that when delivered, it should be first applied to the payment of said additional advances; and about the first of January, 1877, not being ready to deliver the cotton, the defendants requested said Moss & Bell to continue to sell him goods on account of the mortgage until the cotton could be delivered, shipped and sold, assuring them that the cotton would be sufficient to pay the whole, and if not, it should be applied, first, to payment of the excess above the mortgage, and the lands be held to secure what the cotton failed to pay; and on this express agreement they furnished the goods, etc., on said mortgage, up to July 3d, 1877.

They denied that the defendants, (Hughes and wife) ever executed to them any mortgage for their purchases for the year 1877, and alleged that on the second of July, 1877, Hughes made an arrangement with them to supply tenants on his place, and mortgaged thirty bales of cotton to be raised on it, and delivered to them rent-notes to secure the supplies to be furnished them; but this had no connection with the matters in the account sued on.

They transferred the mortgage of 1866, as alleged, with the agreement to supply the said Hughes, as agreed in it, and had done so.

36—38

The cause was heard upon the pleadings, exhibit, and depositions of the parties.   There was a decree for the plaintiffs and the defendants appealed,

For the particulars of the decree and the evidence pertinent to the issues, see the opinion.

*N. T. White and F. J. Wise,* for appellant:

In relation to the increase of the mortgage debt beyond the amount specified in the mortgage, as claimed by appellee under the case of *Bell, Trustee,* v. *Radcliff,* 32 *Ark.,* 645. No such mortgage here, but same is on real estate, and cannot be enlarged beyond the amount specified.   See *Franklin, Trustee,* v. *Meyer, Trustee,* 36 *Ark.,* 97.

The mortgage itself is a limitation of the mortgage debt, and any effort to tack on another debt under a parole agreement, is void.   *Jones on Mortg., vol. 1st, sec.* 360 ; *Johnson, et al,* v. *Anderson,* 30 *Ark.,* 745 ; *Walker* v. *Snediker,* 1 *Hoff.,* 146 ; *Nally* v. *Rogers,* 22 *Ark.,* 227 ; *Whiting* v. *Beebe,* 12 *Ark.,* 428.

The contract itself is the best evidence of the agreement of the parties, and no parol agreement is admissible to explain or alter the same.

A mortgage cannot be extended so as to render it a security for subsequent advances by a parol agreement to that effect.   *Ex-parte Hooper,* 19 *Vesey,* 477 ; *Jones on Mortgages, vol.* 1., *sec.* 360.    It would be in violation of the Statute of Frauds, requiring a writing to charge lands.    1 *Leading cases in Equity,* 862 ; *Am. note,* 4 *Edition* ; *Dean* v. *McLauglin,* 2 *M.,* 599 ; *Walker* v. *Snediker,* 1 *Hoff., Chan. Rept.,* 147.   It is the settled rule in England, as well as in this country, that a mortgage cannot be extended by parol agreement.   4

Hughes v. Johnson, Trustee.

*Kent*, 198; *Craig* v. *Tuppin*, 2 *Sam'l*, *Chan. Rep't.*, 82; *Bank of Utica* v. *Finch*, 3 *Bart.*, ch. 204.

Moss & Bell had no right to make an agreement with Hughes by which their advances made after Jaunary 1st., 1877, should be secured under the mortgage of McGehee, Snowden & Violette.

As to the doctrine of appropriation of payments, see *Chitty on Cont.*, 582. No right of election exists unless two or more accounts exist. *Johnson, et al* v. *Anderson*, 30 *Ark.*, 745. When only one account exists between debtor and creditor, payment goes to oldest item in the account. 1 *Story, Eq. Jurisprudence*, 459; 1 *Parsons*, 633; and this is the rule whether the first items in the account are secured or not. 44 *M.*, 121; 28 *Vt.*, 498; 31 *M.*, 497; 10 *Burt.*, 198; 13 *Denio*, 293; 22 *M. E.*, 138; 9 *Watts*, 386; 9 *Wheaton*, 737; 10 *Conn.*, 175, and in those States where the civil law prevails, the credit is applied to the debt most burdensome to the debtor. *Forstall* v. *Blanchard*, 30 *Ark.*, 745; 28 *Ark.*, 440.

The payments should have been applied in liquidation of the first item in the account, and those items went to make up the mortgage debt. *Cross & Co.* v. *Johnson*, 30 *Ark.*, 399; 2 *Jones on Mortgages*, 907; *N. Y. Ins. Co.* v. *Howard*, 2 *Standf.*, (*N. Y.*,) ch. 183. The court allowed appellees to make the application of the payments up to and at the time of the decree. As the appellees had made the application generally, upon the account, they had no right to change the same after the controversy had begun. See 9 *Wheaton*, 720, 737; 12 *Vt.*, 246, 349; 10 *Conn.*, 283; 31 *Vt.*, 706; 31 *M. E.*, 500. Nor after the presentment and approval of the account. 11 *Barb.*, 80; 3 *Denio*, 291; 2 *Wash.*, *C. C.*, 47; 5 *Watts*, 544, 545; *Harrison* v. *Johnson*, 27 *Ala.*, 445; *Story's Equity Jurisprudence*, sec. 459.

The books of Moss & Bell are conclusive against them. 5 *Denio*, 470 ; 30 *Ark.*, 745.

*Bell and Elliott*, for appellees :

The only question in this case is the appropriation of payments. There are no intervening claims or rights of third parties. It is well settled that a mortgage cannot be extended by parol to subsequent liabilities, but it is equally well settled that the mortgagee is authorized to advance additional supplies to gather and prepare the crop for market ; in other words to protect the mortgaged property. *Bell, Trustee*, v. *Radcliff*, 32 *Ark.*, 635.

1. MORT-GAGE: Effect of assignment of, as security for mortgagee's debt. EAKIN, J. The mortgagees did not lose their interest in the instrument by its assignment to the complainant, as trustee, on twenty-seventh of June, 1876. They themselves owed McGehee, Snowden and Violette, and it was then, and remained a beneficial security for their own claim against the mortgagors, inasmuch as its enforcement would inure to their benefit. The clause of forfeiture in a court of equity amounts to nothing.

It is further clear from the proof that the New Orleans firm left the whole management in the hands of Moss & Bell, who agreed to go on after the assignment and perform the conditions upon which the mortgage was given, by continuing to furnish supplies. Moss & Bell were the real owners of the mortgage throughout. The trustee is not a purchaser for valuable consideration, and he must work out all his equities through Moss & Bell. The case was properly considered as if the contest were between the original parties.

2. SAME: Parol agreement to extend to other debts. It is true that no mortgage of lands can, by parol agreement between the parties, be made to cover any other debt or any larger amount of debt than that expressed. This is

no longer an open question in this State. (*Johnson & Goodrich* v. *Anderson, Trustee,* 50 *Ark.* 745.) The case of *Bell, Trustee,* v. *Radcliff,* 52 *Ark.,* 645, might seem in conflict with this principle. It was there announced that where, upon the face of the mortgage or deed of trust, it clearly appears that the advances of money or supplies were to be made for a specific purpose, and that purpose was the *controlling object* of the mortgage, although a particular sum might be named, it might be presumed that the parties regarded the purpose rather than the amount. In that view it was announced that the instrument would stand good as a security for all advances necessary for the purpose, although the amount might exceed that named. There were other elements in the case quite sufficient to support the decision. It was an effort by a second trustee, expressly subordinate to the first, to confine the security of the first to the amount named, and to take from him the property included in both deeds, after satisfaction of the first to that extent.

It appeared in evidence that the additional advances made by the beneficiaries of the first trust deed had been, at first, refused, but were afterwards made, upon the solicitation of the beneficiary in the second, and upon his express agreement to be responsible for their payment. This, as between the parties, was a clear case of equitable estoppel against the second, and the ultimate decision of the court would have rested on firm grounds without any reference to the controlling purpose, although that, too, came in aid of the decision. The seemingly exceptional principal, although correct, where the controlling inducement is unmistakable upon the face of the instrument, so much so as to make it clear that the parties regarded the *object* more than the *amount,* is, nevertheless, to be applied with great caution, so as not to interfere with the general principle in *Johnson & Goodrich* v.

*Anderson*, (*supra*), as supported by other decisions of this court therein cited. Mortgages might, else, become very much perverted from their legitimate use, and cease to be reliable as written evidence of the real intentions of the parties. Besides, the operation of the doctrine in *Bell* v. *Radcliff*, (*supra*), might, if not well guarded, work great injustice to subsequent purchasers, or incumbrances of the same property. The naming of a particular sum would be a snare, unless it were so plain upon the whole instrument that the parties intended to secure enough, in any event, to accomplish the object, as to put strangers about to deal with the property upon inquiry as to what actually had been, or might necessarily, be required to be advanced. The case of *Bell* v. *Radcliff* has no application to this, where the controlling purpose of, or inducement to the transaction is not prominently put forward, and it is very certain that no application could be sustained to foreclose the mortgage for a greater amount than $1250, with accrued interest, upon any parol agreement that the mortgage should stand good for further advances also. The bill does not seek that, but asks a foreclosure for a less sum.

3. APPRO-
PRIATION
OF PAY-
MENTS:
Running
accounts.
The real and only question is, has the mortgage ever been satisfied in whole or in part? That must be determined by the proper application of the payments. They were made from time to time. The debt secured by the mortgage was a part of an account running through a period of nearly sixteen months, the debts amounting, in all, to more than twice the sum stated in the mortgage. The question of the application of payments to the secured or unsecured portions of the debt is quite distinct from that of the power of the parties to increase by parol, the *amount* for which the security is to be valid. Unless something is shown to prevent it, the law will apply the payments, as made, to the oldest items of the account, working off the

whole debt, as it were, from the bottom strata. As the part secured by the mortgage is, in this case, composed of the oldest items, and the aggregate payments exceed its amount, it will follow that it has been discharged, unless the defendant can show, affiirmatively, that the payments have been rightfully applied to other purposes.

The power to make the application to the earlier or later items of the account rested wholly with the debtor. A running account, although composed of items partly secured and partly not, is in so far one debt, that the creditor has no election as to which items he will credit and which not, in the absence of any appropriation by the debtor. For this, also, see case of *Johnson & Goodrich* v. *Anderson*, (*supra*). The payment goes, by the force of law, to the oldest items. It has never been questioned, however, but that the debtor himself has the power to authorize the apropriation by the creditor to any item. Nor as between the parties themselves, where no rights of others have intervened, can it reasonably make any difference, in this respect, that the payments are made out of part of the mortgaged property left in the control of the mortgagee. Such a transaction would amount, in effect, to a mutual agreement, that a portion of the property should be released from the mortgage, upon the consideration that it be applied to another item of the creditor's claim for which he has no security. In such case there is no objection, which can be reasonably urged, to allowing the mortgage to stand for its full amount, as expressed upon its face; with regard to the remainder of the property, as a security for all the original debt remaining unpaid. In case of subsequent encumbrances it would be different, but amongst the original parties, they being alone interested, they may do as they please with their own. The cases are very numerous which hold that a mortgagee does not lose his security for its full amount against the prop-

*Election of parties: Mortgages*

erty remaining in the hands of the mortgagor at the time by releasing a portion, always presuming that he has no actual or constructive notice of alienations or encumbrances, before that time, made by the mortgagor of the portions not released.

**4. SAME: Time for creditors to elect.** When the creditor, by law or by consent, has the right to make the appropriation, he need not do so at the time of the payment, but may at any time before settlement. Mr. Jones in his work on mortgages, section 908, quotes Lord Hardwicke as saying upon this point there is an abundance of cases.

**5. MORTGAGEES: Reimbursed for advances to preserve mortgaged property.** It is further, a well settled principle in equity, that one who has an interest in a security may advance what is fairly necessary to its preservation, and may retain the advances out of the proceeds before crediting any portion of his debt. There can at least be no doubt of that, where such advances are made by the consent of all parties interested in the property or fund. That was a strong element in the case of *Bell* v. *Radcliff*, (*supra*). This is not upon the idea that the security of the mortgage is thereby extended to other advances, but rather upon the consideration that the proceeds of the property have been diminished by the expenses of preservation.

It remains, by way of preliminary remark, to allude again to the fact that the money, concerning which the questions of application arise, was the fruit of the mortgaged property. Although, as has been said, all parties might agree to have it applied to the unsecured items, yet as that is a diversion from the original intention, the onus of showing such agreement is upon the party claiming it.

In the light of these principles the finding of the facts by the chancellor, and the decree as to the law, must be reviewed.

The cause was heard alone upon the pleadings, and the

depositions of the parties, Bell, Moss and Hughes. The decree recites, as its basis, the execution of the mortgage upon the land and the crop of 1876, and that it was *to enable* the *mortgagor to raise a crop*, and its assignment to complainant on the twenty-seventh of June, 1876. That Moss & Bell continued to furnish the supplies required by the mortgage; that on the first of November, 1876, the full amount of supplies named in the mortgage not being sufficient to complete the crop and gather it, the mortgagees furnished additional supplies at Hughes' request; that on the first of January, 1877, they amounted to $1953, and had been necessary to gather and protect the property from loss. Further that the crop had not been delivered and sold until after the first of January, 1877; that it was after that date agreed that Hughes should continue to purchase goods on account, and that the cotton received should be applied first to the payment of *said* account, and the balance to the credit of the mortgage account; and that Moss & Bell *did* so apply the cotton received after the first of January. Further: That the goods furnished up to the fifth of March, 1877, were so paid for by cotton received and sold up to that time, leaving, by this mode of statement, then due upon the mortgage of principal and interest, the sum of $759.30.

For this amount a decree was rendered, with the usual order of sale for foreclosure. As to the items of account after the fifth of March, 1877, the bill was dismissed without prejudice.

If the recitals are sustained by the evidence, the decree was correct, in so far as it holds that the payments might be applied to the advances made after the mortgage was due, and beyond its amount.

To determine whether the facts were properly found, as recited, a review and analysis of the evidence seems important to any value this case may hereafter have, as a prece-

37–38

dent.   There is no contest as to any other matter than the
application of payments, and we will only notice the evi-
dence which seems relevant to that.

Moss says :   That the statement of the account, in evi-
dence, is correct, and that it had been shown several times
to Hughes, who did not object.   The credits of cotton were
not entered until the cotton was sold and returns of sale
had.   The account to which he alludes is a running one,
made an exhibit in the pleadings.   The debits begin with
the twenty-third of March, 1876, and end with the third of
July, 1877, aggregating $2664.15.   The credits begin with
the thirteenth of May, 1876, and end with the second of
May, 1877, aggregating $1538.96.   Balance, $1125.19,
which is the sum for which suit was brought.   The list of
credits composed very largely of cash and proceeds of cot-
ton, shows that of the latter, the first was received on the
twenty-second of December, 1876, and the last on the fifth
of March, 1877.

In explanation of the fact that the account was kept run-
ning after the first of January, he says :   That they did so
on the repeated request of Hughes, "who always stated
that we had a mortgage on his lands, and that would be
good for the amount."   They told him repeatedly, he says,
that the cotton he had delivered would not pay the account
of 1876, and that which he was making in 1877 ; and request-
ed him to give them another mortgage, which he declined
to do, basing his refusal on the ground that his land was
already bound for the account, and would be good for any
balance that might be due.

Further he says, that in July, 1877, Hughes gave them
an additional mortgage on thirty bales of cotton ; that the
cotton received, under that, went to Hughes' running
account for 1877, as he continued to buy goods after-
wards.   He got credit for all the cotton received by

them on the last mortgage.   Further he says, the last cotton of 1876 was delivered to them in March, 1877, at which time Hughes notified them that there was no more.   Upon cross-examination Moss says that they had shipped cotton on account of Hughes before the first of January, which, at that date, was undisposed of.   Don't know the number of bales.   It was shipped to McGehee, Snowden, & Violette, for whose benefit this suit was brought.   They first learned that Hughes would not be able to pay his account, comparing his debits and his cotton, in February or March.   Witness first approached Hughes in January, 1877, on the subject of securing his account for the current year.

Bell testifies that when the mortgage became due Hughes had not taken up the full amount for which it provided.   He came in and stated that he was compelled to have money and supplies to pick the crop or it would all be lost, and he had no other means of procuring them.   Thereupon they furnished him money and supplies during the months of November and December, and on until the crop was brought into market and turned over to them.   Most of it was not delivered until after the first of the year 1877.   About that time they had a conversation with Hughes, calling his attention to the fact that the year had run out, and expressing a doubt as to whether they would be justified in furnishing anything else under the mortgage.   Hughes, to use the language of the witness, then stated "that as the cotton was not all in, and that what cotton we had received had not been sold, and that, as he understood it, the mortgage we had and the cotton we had received and were to receive, which he had on the place, was sufficient to pay for all the goods he might require until the crop of 1876 was arranged and settled for, and that the cotton which we were to receive after that date was, to the best of my remembrance, to be applied to the payment of whatever he got from us

after that date." Hughes also stated "that he was willing that the mortgage we held on the crop and other property should hold good until such time as we should get accounts of sales of the cotton, and have a final settlement for the year 1876, when he would give us a new mortgage to cover the supplies he was to get during the balance of the year 1877." None of the items in this account are contained in that for which the mortgage of July, 1877, was given. With regard to the items of cash, he says that they were all advanced on Hughes' orders for picking cotton, except $280, which was paid for a gin to gin the crop of 1876. Upon cross-examination he says that they furnished whatever Hughes required, and cannot state what items of the account were essential to make and to save the crop and what not.

The defendant, Hughes, testifies that the cotton credited was the cotton covered by the mortgage of 1876. Does not know what the items of cash were for. The cotton, when turned over, was to be shipped and applied to his account. He gave no directions as to the application. He denies that anything was ever said to him by Moss & Bell about the excess of the account over the amount named in the mortgage until some time in April, 1877; also that either Moss or Bell ever said anything to him about applying the cotton received by them, first to the excess of the account, and holding the land as security for the amount of the mortgage. He says that when he made the thirty-bale mortgage, in July, Mr. Moss remarked that the land mortgage would not hold good, and for that reason he desired the additional mortgage. He says further that the account does not give him credit for all the cotton received from him by Moss & Bell, claiming that he also turned over to them seven bales more of an inferior grade of cotton, of the last picking, worth thirty or thirty-five dollars a bale. He testifies, also, that all the crop of 1876 was gathered before Christmas,

after which time he used no money in picking, and about. that time he notified Moss & Bell that he was through. All the cotton, he thinks, was delivered to Moss & Bell before the first of February. Upon cross-examination he says that Moss & Bell did not advise him of the returns from the cotton until a long time after it was delivered. He continued to run his account until about the first of April, because they had had no settlement of the account of 1876, Moss & Bell excusing themselves for the delay on the grounds that they had no returns from the cotton.

This is substantially all the evidence pertinent to the points in question.

It does not appear from any expressions on the face of the mortgage, nor does it appear from the nature of the items of the account, that the controlling purpose of the mortgage was to enable Hughes to make. a crop in 1876. To bring a case within the principle of *Bell, Trustee,* v. *Radcliff,* something more definite is necessary than to show that the most part of the items of the account were proper for use in cropping, and were so actually used. That case cannot be extended beyond the peculiar circumstances which environed it, or those of like nature, without danger of rendering all limitations of amount in mortgages a vain and useless thing. So far as the decision of the Chancellor may have proceeded on that principle, it had no sufficient foundation in the instrument or the evidence.

The account exhibited, the correctness of which is, on both sides, admitted, shows that the debits were, on the first day of November, slightly in excess of the mortgage,. but they had been reduced by credits before that date to a balance of $1160.13. Partly upon that day, however, and altogether within ten days afterwards, the measure of the mortgage was filled by increased debits of goods and cash.. The terms of the mortgage, and the circumstances justify

the supposition that these further advances, to complete the sum of $1250, were contemplated, and it may be considered that the mortgage debt was complete to the full amount on the first day of November. It is in evidence that between that time and the twenty-fifth of December, the mortgagees advanced cash to save and pick the cotton, and to purchase a gin to gin it. These advances may come under the head of expenses incurred by the mortgagees for the preservation of the mortgaged property, and they are entitled to reimbursement out of the first money which came into their hands from the proceeds of the crop with six per cent. interest, before appropriating any of it to the credit of the mortgage. So far their equities are clear.

The onus was upon Hughes to show that he was entitled to an additional credit of seven bales, or their value. This he did not sustain by a preponderance of evidence. There wase counter-proof that all the cotton received had been included in the credits. The claim was properly disallowed.

The main question remains : Did Hughes authorize the mortgagees to appropriate the first proceeds of the cotton to the unsecured excess of the account? The onus as to this is upon Moss & Bell.

It is not shown by the testimony of Moss. That tends only to show that Hughes endeavored, by parol declarations, to extend the security of the land mortgage over the whole running account, so as to make it binding to supplement what the cotton might fail to discharge. This he could not do.

This leaves a direct conflict between the depositions of Bell and Hughes, the former swearing that such authority was given, the latter denying it, positively. Neither of the witnesses was before the court to indicate anything by their manner. Neither is impeached. Both are interested. The

testimony of Bell is less positive than that of Hughes. He qualifies it by adding, upon this point alone, the words, "to the best of my remembrance." There is reason to suspect that he may have honestly mistaken a promise to extend the mortgage for an authority to apply the proceeds of the mortgaged property first to unsecured items of a debt. We have shown that they are really distinct, and that the latter is necessary to avoid the application in due order.

We are constrained, upon a view of the whole testimony, to believe that the Chancellor erred in finding that Moss & Bell had sufficiently sustained the onus of proof on this point, as well as in holding that the controlling purpose of the mortgage was to enable Hughes to make a crop. We think he erred in the decree, and that the appellant, Hughes, is entitled to have applied, in satisfaction of his mortgage, the proceeds of the crop diminished by the cash advanced by the mortgagees for picking and purchasing a gin.

We have in the transcript all that is necessary to determine a proper decree. To that end, and that the same, when rendered, may be certified to the court below, and the cause remanded for its execution, let the decree be reversed, and the matter be referred to the clerk of this court as master, with the following

### DIRECTIONS UPON REFERENCE.

To state from the evidence and exhibits in the transcript an account between Hughes and Moss & Bell, charging the former with the full amount of the mortgage on the first day of November, 1876.

Crediting him with the sums successively received by Moss & Bell, as shown by the account in evidence, and upon the dates indicated; after allowing them first to retain, by way of reimbursement, with six per cent. per annum interest, all cash advanced by them up to December 25, 1876,

from the time when the debits in November, after deducting credits to the first, reached the sum of $1250; the mortgage debt to bear interest at six per cent. per annum for any balance up to the time of full satisfaction, or until the time of the report, if it be not satisfied.

The matter of costs will be reserved, as well as the other matters essential to a final adjustment of the rights of the parties, until the coming in of the report.